**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-136 (JMC)** |
| **v.** | : | |
| | : | |
| **MATTHEW LEBRUN,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew LeBrun to 6 months' incarceration followed by one year of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.     **Introduction**

Defendant Matthew LeBrun—a 35-year-old bounty hunter/bail bondsman and former Marine who lives near New Orleans, Louisiana— participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

LeBrun pleaded guilty via plea agreement, *see* ECF No. 48, to a misdemeanor violation of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) (Count 4). The government's recommendation is supported by LeBrun's: (1) preparations for, and anticipation of, violence, as evidenced by LeBrun choosing to wear a tactical vest; (2) active pursuit of violent conflict, as reflected in his decision to travel to join the Proud Boys fighting with Black Lives Matter supporters in the wee hours of January 6; (3) participation in the first breaches of police lines on the West side of the Capitol and restricted area; (4) knowledge that he was not allowed to be where he was and total disregard for the law; (5) support for rioters engaged in hand-to-hand combat with police officers; (6) role in escalating and encouraging the chaos by running under the scaffolding and up the stairs to the Upper West Terrace; and (7) entrance into the Capitol by climbing through a broken window that had been shattered right in front of him.

The Court must also consider that LeBrun's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of LeBrun's crime support a sentence of 6 months' incarceration followed by one year of supervised release, as well as 60 hours of community service and $500 in restitution in this case.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.   Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol contained in the Statement of Offense supporting the defendant's plea. *See* ECF No. 49.

*Defendant LeBrun's Role in the January 6, 2021 Attack on the Capitol*

In early January 2021, LeBrun, who was a member of both the Proud Boys and Oath Keepers, traveled from his home near New Orleans, Louisiana to Washington, D.C. to attend rallies in support of former President Donald Trump. He arrived on January 5, 2021.

In the late evening hours of January 5, 2021, and the early morning hours of January 6, 2021, LeBrun exchanged a series of text messages with members of the Oath Keepers, including Donovan Crowl,[2] in which they discussed plans for LeBrun to meet up with a group of Oath Keepers at the hotel in Ballston, Virginia that was serving as their base of operations, where the Oath Keepers had stored a cache of weapons in anticipation of violence the next day.

In order to identify himself, LeBrun sent Crowl a text message featuring the below picture of himself and captioned "Matthew LeBrun." In the below photograph, which appears to have been taken in Washington, D.C. given the appearance of the building in the background, LeBrun was wearing a black tactical vest over a gray vest. The tactical vest was adorned with an American flag patch where the logo for the "Three Percenters" militia group took the place of the stars.

---

[2] Crowl was separately prosecuted for his conduct related to the January 6 riot in case number 21-cr-28-APM and convicted, after a bench trial in which Crowl stipulated to the facts, of violating 18 U.S.C. § 1512(k) (conspiracy to obstruct an official proceeding) and 18 U.S.C. § 231(a)(3) (civil disorder).

LeBrun also appeared to be wearing a body camera, which was attached to the tactical vest on the left side (photographic right) of LeBrun's chest.



*Image 1: selfie photograph sent by LeBrun to Crowl on January 5, 2021*

After initially agreeing to join the Oath Keepers group, LeBrun changed his mind. At approximately 4:23 a.m. on January 6, 2021, LeBrun texted Crowl that he "got called to respond to antifa in freedom plaza. Supposedly they busted a woman in the face. Going to meet up with some guys now." Approximately two hours later, LeBrun texted Crowl, "Hey brother imma crash in dc with the pbs n meet up with y'all tomorrow at some point we're out toying with blm lol." In this context, "pbs" is an acronym for the Proud Boys, "blm" is an acronym for "Black Lives Matter" supporters, and "lol" is an acronym for "laugh[ing] out loud."

Later that morning, *i.e.* the morning of January 6, 2021, LeBrun rendezvoused with a large group of Proud Boys on the Ellipse, including his co-defendant Steven Miles. LeBrun was wearing the same clothing and the same tactical gear as depicted in Image 1. The large group of Proud Boys did not attend the "Stop the Steal" rally or stick around to listen to former President Trump's speech. Instead, they marched on the Capitol building *en masse*. As the group, which included

LeBrun, marched down Constitution Avenue, they engaged in various chants and response calls, including "F*** Antifa!" and "Whose streets? Our streets!" *See* Image 2.



*Image 2: LeBrun and Miles marching with the group of Proud Boys down Constitution Ave. and toward the Capitol*

The group of Proud Boys, including LeBrun, stopped at or around 12:15 p.m. near Second Street and Constitution Avenue, NW, near some food trucks, before making their way to the west side of the outer secure perimeter surrounding the Capitol grounds on First Street, NW. There they were among the first people to breach the restricted perimeter and approach the Capitol building from the west side. Along the way, LeBrun observed and ignored multiple indications that he was not permitted on the Capitol grounds, including barricades, signs, and lines of police officers in riot gear. LeBrun later admitted that he knew he and his fellow Proud Boys lacked authority to be where they were, but none of that deterred him.

Once on the West Plaza, LeBrun and the other Proud Boys in his group again found police officers attempting to block their progress. LeBrun paid no heed to the officers. *See* Image 3.



*Image 3: LeBrun and Miles entering the West Plaza despite police officers' (circled in yellow) efforts to secure the area*

After penetrating deeper into the West Plaza, LeBrun, Miles, and other rioters engaged in a confrontation with riot gear-clad police officers who were protecting the Capitol. The confrontation began as a verbal argument and then escalated into a physical fight, as seen in Image 4.



*Image 4: Miles fighting with police officers as LeBrun supports him from behind*

The police officers used a variety of crowd control tactics, including spraying chemical irritants, to try to contain and repel the rioters, such as Miles and LeBrun. When the rioters temporarily fell back and regrouped, LeBrun and Miles assisted rioters who had been sprayed with those chemical irritants, as shown in Image 5.



*Image 5: Lebrun and Miles helping a fellow rioter who appears to have been hit with a chemical irritant, which he is attempting to treat with a white opaque liquid, likely milk.*

LeBrun did not leave the Capitol grounds at this point, however. Instead, he—and Miles—pushed deeper into the West Plaza, further probing the police line and searching for ways to breach it.

Meanwhile, there was scaffolding erected near the northwest side of the Capitol as part of the ongoing construction of the stage and bleachers for the upcoming presidential inauguration. White plastic sheeting covered the scaffolding. At around the same time LeBrun and Miles reached the area of the scaffolding, other rioters slashed the plastic sheeting surrounding the scaffolding, which revealed a staircase under the scaffolding that led to the Upper West Terrace, an area that previously had been inaccessible to the rioters. The destruction of the plastic sheeting created a catastrophic breach, and LeBrun—along with many others—took advantage of it. LeBrun and

Miles maneuvered their way through the crowd and under the scaffolding so that they could access that newly exposed staircase. *See* Image 6.



*Image 6: LeBrun and Miles (outlined in yellow) walking under the scaffolding and toward the staircase*

At approximately 2:10 p.m., LeBrun and Miles traveled up the staircase from the west front to the Upper West Terrace of the Capitol. *See* Image 7.



*Image 7: LeBrun and Miles ascending the exterior staircase to access the Upper West Terrace*

At approximately 2:12 p.m., U.S. Capitol CCTV footage depicts individuals banging on the Senate Wing Door and the windows on either side of the door with their fists and other blunt items, including planks of wood and a U.S. Capitol Police riot shield. Within one minute, rioters successfully smashed in a window on one side of the Senate Wing Doors and unlawfully entered the U.S. Capitol Building. A handful of people entered the building through the broken window and opened the Senate Wing Door. They were the first to breach the interior of the Capitol. Meanwhile, other rioters, including Miles, continued to smash the window on the other side of the Senate Wing Door. Miles then entered through the window he had helped to smash. LeBrun entered the Capitol building through that smashed window shortly after Miles. *See* Image 8.



*Image 8: LeBrun entering the Capitol by climbing through the Senate Wing Door window that Miles just finished smashing*

After succeeding in their violent and destructive entry, which facilitated the entry of scores of other people into the Capitol through the same broken window, Miles and LeBrun briefly walked through the Capitol building. They turned toward the Senate and, along with others, soon

encountered a police line and were directed out of the building. LeBrun and Miles then exited

through the Senate Carriage Door, having spent a total of approximately three minutes inside the

Capitol building. *See* Image 9.



*Image 9: LeBrun and Miles exiting the Capitol building*

Later, while outside of the restricted Capitol grounds, LeBrun and Miles met another

liked-minded individual and posed for a photograph with him/her. The individual provided that

photograph, which appears below, to FBI agents and said that while talking to him/her, LeBrun

and Miles bragged that they had broken into and entered the Capitol building by breaking a

window.



*Image 10: LeBrun and Miles posed for photograph with an individual who overheard them bragging about entering the Capitol illegally by breaking a window*

*Defendant's Arrest and Interview*

Immediately after the government charged LeBrun by complaint, *see* ECF No. 1, FBI agents contacted LeBrun's counsel and asked LeBrun to surrender, which he did just a few days later. At that time, LeBrun—with counsel present—submitted to an interview, in which LeBrun admitted all of the above conduct and expressed remorse for his actions. LeBrun also consented to allow FBI agents to search his laptop and cell phone, but they did not find anything of evidentiary value on it.

*The Charges and Plea Agreement*

On April 20, 2022, a grand jury sitting in this District charged LeBrun by indictment with four misdemeanors: violations of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted

Building or Grounds) (Count 4); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count 5); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds) (Count 7); and 40 U.S.G. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) (Count 9). On October 19, 2023, pursuant to a plea agreement, LeBrun pleaded guilty to Count 4, the charged violation of 18 U.S.C. § 1752(a)(1). *See* ECF No. 48. By plea agreement, LeBrun agreed to pay $500 in restitution to the Architect of the Capitol. *See id.* at 8.

### III.    Statutory Penalties

LeBrun now faces sentencing for Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office ("Probation"), LeBrun faces up to twelve months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Here, the government agrees with the Sentencing Guidelines calculation set forth in the PSR with one exception: the PSR errs in applying U.S.S.G. § 4C1.1, a new guideline—created in recent amendments to the Sentencing Guidelines for 2023—that provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. *See* PSR ¶ 44. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case, for the following reason: even though LeBrun himself did not assault or even make physical contact with a police officer assault, he did support others—such as his co-defendant, Steven Miles—as they fought with officers on the West Plaza. In standing just behind Miles, yelling at the officers while wearing a tactical vest as Miles and others fought with them, LeBrun—under a totality of the circumstances—encouraged others to engage in violence, facilitated violence, and/or threatened violence himself. As such, LeBrun is disqualified from receiving the benefits of Section 4C1.1.  The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence: *United States v. Gundersen*, 21-cr-137 (RC), *United States v. Baquero*, 21-cr-702 (JEB), and *United States v. Dillard*, 23-cr-49 (JMC).

The Court should not apply § 4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop

13

itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

Probation calculated LeBrun's criminal history as a category I. PSR at ¶ 49. Accordingly, the Probation calculated LeBrun's total adjusted offense level, after acceptance and application of § 4C1.1, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 46, 89.

While the government objects to Probation's application of § 4C1.1 and the two-level decrease in LeBrun's offense level that comes with it, the Court's ruling on this issue will not impact LeBrun's Guidelines range; either way, whether LeBrun's final offense level is 2, as Probation calculates, or 4, as the government advocates, his Guidelines range will be 0-6 months of incarceration.

LeBrun's plea agreement contains an agreed-upon Guidelines calculation that mirrors the government's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 6 months' incarceration followed by one year of supervised release, as well as 60 hours of community service and $500 in restitution in this case.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing LeBrun's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like LeBrun, the absence of violent or destructive acts is not a mitigating factor. Had LeBrun engaged in such conduct, he would have faced additional criminal charges, such as those charged against his companion and co-defendant, Steven Miles.

The most important factors in LeBrun's case all concern his embrace of the violence that occurred on January 6, 2021. It was not a surprise to LeBrun; he prepared for it by donning a tactical vest and body camera. It was not unwelcome to him; he purposefully sought out violence, choosing to travel to join a group of Proud Boys who were fighting with Black Lives Matter

supporters in the early morning hours of January 6. And it was not something he reserved for civilians; while LeBrun did not assault any police officers himself, he supported his fellow rioters who did, even after police officers used chemical irritants to repel them.[4]

Additionally, the manner in which LeBrun entered the Capitol building places him amongst the most culpable misdemeanor defendants. He cannot claim he was merely following the crowd; LeBrun was among the first to enter the Capitol building. He cannot claim that he thought their entrance was somehow lawful either; LeBrun entered by climbing through a broken Senate Wing Door window, which his companion, Steven Miles, shattered with a wooden beam right in front of him just moments earlier. LeBrun—looking formidable in his tactical vest—no doubt served as an inspiration for other rioters and indeed hundreds of others followed him, entering the Capitol by climbing through that same broken window after him. LeBrun, and those like him in the vanguard, created a permission structure that other rioters followed.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of six months of incarceration in this matter.

### B. LeBrun's History and Characteristics

As set forth in the PSR, LeBrun has no criminal history. PSR ¶¶ 47-52. LeBrun has generally worked throughout his adult life, first as a welder, then as an unsuccessful serial entrepreneur, and now as a self-employed bail bondsman. He served briefly in the Marines over the course of two summers, only completing basic and unit training but never deploying, receiving

---

[4] The government acknowledges the lack of evidence of direct statements by LeBrun (as noted above, nothing of evidentiary value was found on his computer or phone, indicating that LeBrun either never made such statements or deleted them) and/or that LeBrun himself assaulted or otherwise made physical contact with police officers. Indeed, even though LeBrun's physical presence and actions interfered with police efforts to defend and secure the Capitol grounds and building, these are the principal reasons why LeBrun did not face felony charges here.

a general discharge at the lowest rank. LeBrun was in a plea posture from the moment the FBI contacted him about this investigation and has been compliant with his conditions of pre-trial release.

While LeBrun's military service is laudable, even if short, it renders his conduct on January 6 all the more outrageous. As a former member of the military, who took an oath to defend this country and its laws, LeBrun was well aware that his actions on January 6, 2021 were not just illegal, but contrary to his oath. He knew fighting the police was wrong, and he presumably understood better than most from his training how vulnerable and overwhelmed the police were during the riot. He did not leave and he did not help them; instead, he contributed to the chaos they faced. Moreover, LeBrun knew he had no right to enter the Capitol in those circumstances, let alone by climbing through a broken window. In light of LeBrun's former military service and training, his voluntary decision to storm a guarded government building is disturbing.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a 6-month term of incarceration.

First, although LeBrun accepted responsibility by pleading guilty and expressed embarrassment to the FBI agent who interviewed him, he has not taken any public steps to denounce his words and actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. The Court should view any remorse LeBrun expresses at sentencing with skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came

when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Second, LeBrun's membership in and/or promotion of extremist groups such as the Proud Boys, Oath Keepers, and Three Percenters should give this Court pause as well. Like others in those groups, LeBrun did not accept the results of the 2020 presidential election, so on January 6 he dressed for violence, sought out others literally willing to "fight for Trump" (as many chanted on January 6), marched on the Capitol, encouraged violence against police, and climbed through a broken window to invade the Capitol. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence LeBrun in a manner sufficient to deter him specifically, and others generally, from going down that road again. Indeed, while LeBrun has no criminal history, in this case traditional mitigating factors like that do not negate the need for specific deterrence, given the political violence on January 6 and the risk that it will recur.

Additionally, St. Tammany Parish, Louisiana court records reflect that at least one person in LeBrun's community fears physical violence from him. In July 2022, an individual sought and received a restraining order against LeBrun on the basis of alleged stalking behavior and a series of direct, explicit threats of physical violence by LeBrun against the individual. For example, LeBrun threatened to kill the individual by cutting his throat "ear to ear" and "make it so slow and torturous" with a "dull ass knife bitch slowly shoved in my a jugular [*sic*]." A month later, however, the threatened individual had the order dissolved when LeBrun moved to a different residence and thus was no longer in close proximity to the individual, reducing the threat. While the government cannot prove the above incidents occurred as described by the individual, the

allegations alone are alarming, particularly given that they occurred while LeBrun was on pre-trial release in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence LeBrun based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

LeBrun has pleaded guilty to Count 4 of the Indictment, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. That being said, the government generally has recommended, and judges have imposed, sentences of incarceration on misdemeanor defendants convicted of violating 18 U.S.C. § 1752(a)(1) who prepared for the riot by wearing tactical gear, demonstrating that they anticipated violence, *see, e.g.*, *United States v. Vargas Santos*, 21-cr-47-RDM (wore tactical vest; sentenced to 4 months of incarceration), were active members of an extremist group, *see, e.g.*, *United States v. Ashlock*, 21-cr-160-TJK, (member of the Proud Boys who marched with the group to the Capitol; sentenced to 70 days' incarceration), or were amongst the earliest entrants into the Capitol via the Senate Wing Door/Window breach, *see, e.g.*, *United States v. Steele-Smith*, 21-cr-77-RDM (climbed through

broken window, sentenced to 4 months' incarceration). Here, a substantial period of incarceration would be appropriate for LeBrun if he fell into any one of those categories. All three apply.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Niemela*, 21-cr-623-CRC, a jury convicted the defendant of four misdemeanor offenses, including 18 U.S.C. §§ 1752(a)(1), for conduct similar to LeBrun's. On January 6, Niemela, like LeBrun, repeatedly walked past and ignored signs that the Capitol building and grounds were restricted, directly observed physical fighting between police officers and rioters, took advantage of the same breach to ascend the northwest exterior stairs and reach the Upper West Terrace, and entered the Capitol through the Senate Wing Door as the alarm sounded. Like LeBrun, Niemela's personal history contains allegations of violence and threats against others in connection with a restraining order. Unlike, LeBrun, however, Niemela actively promoted violence on social media, stayed inside the Capitol building for over 20 minutes, was part of three separate breaches of police lines, even if she did not personally touch a police officer, and has refused to accept responsibility or express remorse. Nevertheless, Niemela did not wear tactical gear, like LeBrun, or crawl through a just-broken window to enter the Capitol. She is not a member of any extremist groups, and she did not come to Washington, D.C. seeking violence, or intentionally travel to engage in any, like LeBrun did in the early morning hours of January 6. As such, the government's recommended sentence for LeBrun—just over half of the 11-month sentence imposed in Niemela's case—is appropriate.

*United States v. Jeffrey Grace*, 21-cr-296-RDM, also provides a useful comparator. Grace was a "probate" of the Proud Boys at the time of January 6, traveled to Washington, D.C. with

other Proud Boys, and marched on the Capitol with an organized group of Proud Boys. Like LeBrun, Grace positioned himself just behind the front line of rioters who committed the first breaches of police lines, witnessed and ignored repeated signs that he was unlawfully within a restricted area, and was among the first wave of rioters to unlawfully enter the Capitol building, though Grace was almost 10 minutes behind LeBrun. In the reverse of LeBrun, Grace exited the Capitol by climbing through a broken window. Judge Moss sentenced Grace to 75 days of incarceration. Grace and LeBrun's cases are not a perfect match, however. Grace presented aggravating factors that are not present in LeBrun's case; FBI agents confirmed that Grace destroyed evidence, Grace lied to the agents, Grace attempted to financially profit from his January 6-related crimes, and Grace made numerous public statements minimizing his criminal conduct. Yet in many ways LeBrun's conduct was worse than Grace's. LeBrun prepared for violence. He sought it out. He was among the very first to enter the Capitol building and did so by climbing through the window his companion just broke, leading others by example. And LeBrun engaged in all of this criminal conduct despite being a former Marine and a current bail bondsman and bounty hunter, a career that is at minimum law enforcement-adjacent.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that LeBrun must pay $500 in restitution, which reflects in part the role LeBrun played in the riot on January 6.[7] Plea Agreement, ECF No. 48 ¶ 13. As the plea

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 7, 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) LeBrun's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 111.

### VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence LeBrun to 6 months of incarceration followed by one year of supervised release, as well as 60 hours of community service and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on LeBrun's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel, Capitol Siege Section
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33606
michael.gordon3@usdoj.gov
(813) 274-6370